**MONSANTO COMPANY, Plaintiff**

v.

Mitchell **SCRUGGS;** Eddie Scruggs; Scruggs Farm & Supplies, LLC; Scruggs Farm Joint Venture; HES Farms, Inc.; MES Farms, Inc.; and MHS Farms, Inc., Defendants.

No. 3:00CV–161–MPM–DAS.

United States District Court,
N.D. Mississippi,
Western Division.

Sept. 7, 2012.

Brad Best, Michael Noel Watts, Holcomb Dunbar, Oxford, MS, Frank S. Thackston, Jr., Lake Tindall, LLP, Heather Dale Hudson, McTeer-Hudson Law Firm PLLC, Greenville, MS, Joseph C. Orlet, Matthew R. Grant, Husch Blackwell Sanders LLP, St. Louis, MO, Kimberly Jones Merchant, Mississippi Center for Justice, Indianola, MS, Charlie J. Harris, Jr., Seyferth Blumenthal & Harris LLC, Kansas City, MO, Edward Blackmon, Jr., Blackmon & Blackmon, Canton, MS, for Plaintiff.

Dennis C. Sweet, III, Sweet & Associates PA, James L. Robertson, Linda F. Cooper, Wise, Carter, Child & Caraway, Jackson, MS, Jim D. Waide, III, Waide & Associates, PA, Lisa Scruggs Rohman, Lisa Scruggs Rohman, Attorney, Tupelo, MS, for Defendants.

### ORDER

MICHAEL P. MILLS, Chief Judge.

This cause comes before the court on the motion of the parties for various post-trial relief in the above-entitled action. On September 21, 2010, a jury awarded plaintiff Monsanto Company a total of $8.9 million in damages against defendants for the infringement of patents covering the Roundup Ready® and Bollgard® seeds which it developed. The primary issues which the court must now resolve are whether defendants are entitled to a new trial or, failing such, whether Monsanto is entitled to an award of treble damages and/or attorneys' fees based on the jury's finding that defendants willfully violated its patents. Having considered the memo-

randa and submissions of the parties, and having conducted a hearing on this issue on August 22, 2012, the court is now prepared to rule.

Due to the untimely death of Judge Pepper, this court finds itself in the unusual and undesirable position of entertaining post-trial motions regarding a trial which it did not witness. Moreover, this trial occurred in a patent case over a decade old which Judge Pepper characterized as one of the most complex which he had ever encountered. Given that this court did not witness the trial, it is, for all practical purposes, being called upon to conduct an appellate review of this case, based upon a written record of the trial proceedings. Appellate issues in patent cases have been deemed sufficiently complex and specialized that all such cases are appealed to a single appellate court: the U.S. Circuit Court for the Federal Circuit. This court obviously lacks the authority to resolve the appellate issues in this case, nor does it have anything approaching the unique expertise in patent matters developed by the Federal Circuit.

The court notes the foregoing in order to explain why, in light of these unique and regrettable circumstances, it intends to be highly deferential to the legal rulings made by Judge Pepper and the factual findings made by the jury in this case. It would, simply stated, be impossible for this court to develop anything approaching the expertise gained by Judge Pepper following years of supervising this case, and, not having actually witnessed the testimony at trial, this court is in a poor position to question the factual findings made by the jury. Having reviewed the parties' post-trial submissions, the court sees no arguments raised by either party which would lead it to second-guess any of the legal rulings made by Judge Pepper or the factual findings made by the jury. The court

will therefore deny the post-trial motions for new trial and/or remittitur, and it will concentrate on resolving the issues—foremost among them the treble damages issue—regarding which the parties have not already received a ruling from Judge Pepper or the jury. In so doing, however, the court will make some brief observations regarding the post-trial issues raised by defendants.

The court finds the $8.9 million in damages to be within the upper range of compensatory damages which the jury might reasonably have awarded in this case. The figure is close to the amount requested by Monsanto at trial, and it was vastly in excess of the amount of damages which defendants suggested was appropriate. Still, Scruggs is in a poor position to challenge the amount of compensatory damages awarded at trial, particularly in light of the fact that, it now seems clear, he actually sold the infringing seeds which he grew on his land. Scruggs did not sell these seeds under particularly egregious circumstances, considering that he had always sold seeds grown on his land in the course of his business as a farmer/retailer. Moreover, he sold the infringing soybean seeds at the price of $9.50/bag, which is far cheaper than the $25/bag retail price suggested by Monsanto. The evidence thus offers some support for Scruggs' assertion that he was simply doing what he had always done, and the price which he charged suggests that he was not attempting to extract the maximum profits for himself on the back of Monsanto's research. Moreover, as discussed below, Scruggs sold the seeds during a time period when the law regarding the patentability of trait-bearing seeds had yet to be definitively established.

While Mitchell Scruggs did not sell Monsanto's seeds under the most reprehensible circumstances, he did, it now seems clear,

sell them. In so doing, he opened himself up to the potential for exponentially greater compensatory damages than if he had simply re-planted the patented seeds grown on his land but not sold them to third parties. The reason for this should be obvious: unlike most patented products, trait-bearing seeds are capable of reproducing themselves, and the testimony at trial established that Monsanto's patented seeds looked the same as regular seeds and can only be identified by genetic testing. Under these circumstances, Scruggs inflicted an economic harm upon Monsanto which is difficult to quantify, given that it is impossible to know with any degree of certainty to what extent the seeds which he sold, or their progeny, might have been re-planted or re-sold by the farmers who bought them. The jury was asked at trial to make a finding in this regard based largely upon highly technical economic and market-based expert testimony, and the amount which it awarded suggests that they accepted Monsanto's expert testimony at trial as being largely accurate.

Given the nature of Scruggs' actions and the limited proof which he offered in this regard at trial, the court finds his challenges to the jury's award of compensatory damages to not be well taken. The court does not doubt that the *effect* of the jury's verdict must seem highly punitive to Scruggs personally, since he did not profit from his infringement to anything approaching the amount of damages awarded by the jury. This is not the relevant test for compensatory damages, however, and, having reviewed the parties' post-trial arguments, the court is unable to conclude that the verdict is outside the scope of what the jury could reasonably have awarded. This is particularly true considering that, once again, this court did not witness the testimony at trial and is thus in a poor position to question the jury's evaluation of that testimony.

The fact that this court is operating under serious limitations in considering these post trial issues was made evident from the arguments at the August 22 hearing. In seeking a new trial at that hearing, defendants placed considerable emphasis upon the fact that two of Monsanto's expert witnesses—Dr. Timothy Conner and Duane Goldmon—had been incorrectly listed as fact witnesses in draft copies of the pre-trial order that had been circulating among the parties. At the hearing, counsel for Scruggs argued that he had been unfairly surprised by the expert testimony of these witnesses, even though he conceded that the witnesses had been properly disclosed as expert witnesses at an earlier stage of the litigation.

This matter was argued extensively on the record before Judge Pepper at trial, and, having actually supervised the litigation for years, Judge Pepper expressed considerable skepticism that the testimony of the experts in question actually came as a surprise to Scruggs. Indeed, counsel for Scruggs conceded in arguments before Judge Pepper that he was well aware from past experience that Monsanto routinely presented expert testimony of the sort offered by these witnesses:

> Judge Pepper: All right. I'm not sure you can—you may be able to claim that they should have done a better job of disclosing something, but are you really caught off guard by it?
>
> Counsel for Scruggs: I'm caught off guard in the sense that this witness was required, given the description of other Monsanto cases, I made, this witness should be held to be one who would be required to file a report.
>
> Judge Pepper: Well, that's my point. I thought from what you said that a witness like him has been required, has

appeared in every Monsanto case that you have been involved with.

Counsel: Some that I haven't been involved with and I just know about. The court: But no report was filed.

Counsel: Well, I mean, that doesn't mean that the rule should not be enforced today.

[T. At 289–290].

Importantly, Judge Pepper also noted that both sides to the litigation had been derelict in preparing the pre-trial report and that a final copy of same had not even been submitted to him for his review:

Judge Pepper: Gentlemen, do I have a Final Pretrial Order? You have your hands full now, but I will tell you, it's—I have never seen a case like this where you go in and you don't have a Final Pretrial Order. I would suggest that as soon as it is—give it some attention that you get it to me ok?

[T. at 284]. In the court's view, Scruggs is in a poor position to complain about errors in a *draft copy* of a pretrial order which had not even been submitted to the court for its review, as of the date of trial. Indeed, it is not even clear to this court that draft copies of proposed orders are part of the formal case record at all. Regardless, it seems clear that, within the context of this litigation, both sides had "dropped the ball" with regards to the pretrial order, and, under these circumstances, it would be unfair to permit Scruggs to place undue emphasis upon errors contained in a draft copy of that order. This is particularly true since, to reiterate, it seems clear that the subject matter of the expert testimony in question did not come as a genuine surprise to Scruggs' counsel.

Another post-trial issue raised by Scruggs involves alleged errors in a matter regarding which he bears a considerably greater degree of fault. That is, Scruggs objects to the fact that the Amended Verdict form in this case asked the jury to find whether "Mitchell Scruggs or Scruggs Farm Supply, LLC made sales of brown bag soybean seed containing the Roundup Ready® gene?" The jury answered this question in the affirmative, and Scruggs now objects that the use of the word "or" as it appears in this Amended Verdict Form was confusing as to which entity the damages were being awarded against. In particular, Scruggs argues that the jury's $6.3 million verdict for infringing brown bag soybean sales should be entered against Scruggs Farm Supply, LLC and not against him personally.

The court has serious problems with Scruggs' attempts to utilize this error as a basis for challenging the jury's verdict. First, as emphasized by Monsanto, Scruggs, through counsel, participated in drafting and approving the Amended Verdict Form. Second, the error which Scruggs now claims to be flagrant and worthy of setting aside the jury's verdict was one which neither he nor his many excellent attorneys saw as even being an issue until *two years after the verdict was entered.* Indeed, this issue was raised for the first time towards the end of the August 22, 2012 hearing before this court, which raises questions in this court's mind as to how serious the error could be if it was overlooked by numerous attorneys for such a lengthy period of time. Third, in his briefing on this issue, Scruggs presents no evidence that there is any real factual distinction between himself and his business Scruggs Farm Supply, LLC. Presumably, if Scruggs had any real argument to make in this context, then he would have presented it in his briefing on that issue. He did not. In fact, it is only Monsanto which, in its briefing, cites trial testimony which appears to indicate that Mitchell

Scruggs regarded himself and his business as being one and the same.

On a certain (cynical) level, the Amended Verdict Form can be regarded as the perfect defense jury instruction. That is, if the jury had answered the question negatively, then there would be no argument that Scruggs should be held liable. However, since the jury answered the question in the affirmative, this gives Scruggs the opportunity to seek to "blow up" the jury's verdict based upon the language of an instruction that his counsel assisted in drafting. The amended verdict form can thus be regarded as a "heads I win, tails you lose" jury instruction, and the law should, if at all possible, prevent litigants from benefitting from such instructions. The court does not suggest that the instruction in question was deliberately planted by Scruggs with this objective in mind, but he clearly seeks to benefit from an error which he, through counsel, assisted in making.

The court does find, however, that this new issue is significant enough that it should only be resolved after additional briefing from the parties. This court ordered the parties to submit briefing on this issue on a rather short schedule, and, upon reflection, it concludes that they should be given additional time in this regard. It is apparent that both sides are requesting specific rulings from this court which must be dealt with after careful consideration of both the law and facts of this case. In its brief, Monsanto asks that this court enter judgment against *both* Mitchell Scruggs and Scruggs Farm Supply, LLC, writing that:

> Even if Defendants had not waived their objection to the language of the Amended Verdict Form, language that counsel for Defendants *assisted in drafting* (which they have), it is clear based upon the testimony at trial, in conjunc-

tion with the language of the Amended Verdict Form, that this portion of the judgment should be entered against *both* Mitchell Scruggs and Scruggs Farm Supply, LLC.

A "judge has a duty to attempt to reconcile a jury's apparently inconsistent responses" to a verdict form. *See Carr v. Wal–Mart Stores, Inc.,* 312 F.3d 667, 670 (5th Cir.2002). A court "must attempt to reconcile the jury's findings, by exegesis if necessary." *Ellis v. Weasler Eng'g, Inc.,* 258 F.3d 326, 343 (5th Cir. 2001) (citing *Gallick v. Baltimore & O.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)). If the answers to the interrogatories seem to conflict, the court is obligated to reconcile the answers, if possible, to validate the jury's verdict. *White v. Grinfas,* 809 F.2d 1157, 1161 (5th Cir.1987).

For his part, Scruggs argues that the issue is whether this court should "pierce the corporate veil" of Scruggs Farm Supply, LLC in order to hold him personally liable based on the jury's verdict. While the parties differ on how the legal issues in this context should be addressed, they both appear to contemplate this court making significant new rulings regarding issues which have only been raised at the last possible moment in this lengthy litigation.

Hopefully, the parties' revised briefing will more clearly establish the legal framework in which this issue should be resolved. While the court is presently undecided in this regard, it is clear that the decision to sell Monsanto's patented seeds was made by a human being, not an LLC. The court is interested in ascertaining whether Mitchell Scruggs presented any actual *proof* at trial, or even made an argument before the jury, that some individual at Scruggs Farm Supply, LLC other than himself might have made the deci-

sion to sell Monsanto's patented seeds without his knowledge.[1] The court doubts that this is the case, since the seeds in question were grown on Scruggs' own farm, and it is difficult to imagine how someone at Scruggs Farm Supply, LLC could have sold the seeds without his knowledge.

If the court does conclude that Mitchell Scruggs was the individual at Scruggs Farm Supply, LLC who decided to sell Monsanto's patented seeds, then it will be strongly disinclined to permit him to escape liability based upon the language of an instruction that he assisted in drafting. The court concludes that additional briefing is necessary in this regard, however, and it orders the parties to submit such briefing within two weeks of this order. This issue aside, the court will deny defendants' motions for new trial and/or remittitur, and it will turn to the primary issues regarding which the parties have not already received a ruling: those of treble damages and attorneys' fees.

## II. Should the court award Monsanto treble damages and/or attorney's fees in this case?

Monsanto has moved for this court to award it almost $27 million in treble damages, as well as an additional award of attorneys' fees, based upon the jury's finding that Scruggs engaged in a willful patent infringement in this case. Under 35 U.S.C. § 284, when there is willful patent infringement, the Court may "increase the damages up to three times the amount found or assessed."

▆▆▆ There is a two-step process for determining whether damages should be increased under this provision. *Jurgens v.*

*CBK, Ltd.,* 80 F.3d 1566, 1570 (Fed.Cir. 1996). The first step is to determine whether the infringer has engaged in conduct upon which increased damages may be based. The jury's finding of willfulness normally satisfies this test. The second step is for the court to determine the amount to increase the damages based upon a totality of the circumstances. "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 826 (Fed.Cir.1992). In making this determination, the court must consider "factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating." *Id.* *Read* examined a number of cases and listed nine factors that may appropriately be considered, including:

(1) whether the infringer deliberately copied the ideas or design of another;

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

(3) the infringer's behavior as a party to the litigation;

(4) defendant's size and financial condition;

(5) closeness of the case;

(6) duration of the defendant's misconduct;

(7) remedial action by the defendant;

(8) defendant's motivation for harm; and

---

1. This court is only interested in evidence in this regard which is already part of the formal record in the case. It is far too late in the day for the parties to be submitting new evidence now that this issue has arisen.

(9) whether defendant attempted to conceal its misconduct.

*Read,* 970 F.2d at 827.

■■ This court may also award attorneys fees in an "exceptional case." 35 U.S.C. § 285. The decision to award attorney fees under 35 U.S.C. § 285 in "exceptional" cases is discretionary with the trial court judge. *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed.Cir.1989). "Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit." *Id.* at 1551. *Amsted Industries Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 376 (Fed.Cir.1994). Again, the cases have described a two-step process for determining whether to award fees: the court must first determine whether a case is exceptional, and then the court must determine whether attorney fees are appropriate. *Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1460 (Fed.Cir.1998).

In determining whether treble damages and/or attorneys' fees should be awarded in this case, this court will first engage in a more general discussion of the considerations which lead it to conclude that an imposition of such damages would be unjust in this case. It will then engage in an analysis of the nine *Read* factors, which likewise counsel against an award of treble damages in this case, albeit more narrowly. Finally, the court will discuss the recent decision of the Federal Circuit in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.,* 682 F.3d 1003 (Fed.Cir.2012), which renders the issues in this context considerably clearer.

In concluding, as a general equitable matter, that an award of treble damages would be unwarranted in this case, this court finds fully persuasive the decision of

U.S. District Judge Catherine D. Perry in *Monsanto Co. v. McFarling,* 2005 WL 1490051 (E.D.Mo.2005). In *McFarling,* as in this case, a jury found that a north Mississippi farmer had willfully infringed upon Monsanto's patent covering its Roundup Ready seeds. In nevertheless denying Monsanto's motion for treble damages and attorneys' fees, Judge Perry concluded that "McFarling's conduct here does not rise to the level of egregious behavior for which those patent remedies were designed." In so concluding, Judge Perry placed considerable weight upon the fact that, during the 1998–2001 time frame, the legal standards governing farmers' time-honored practice of "seed saving" were still evolving. Specifically, Judge Perry wrote that:

> The concept that a farmer could infringe a patent by growing a plant from seed he had harvested from his own crop was novel. There was an apparent conflict between the Plant Variety Protection Act, which allowed farmers to save protected seed for their own use, and utility patent law, which did not.

Judge Perry further noted that it was not until 2001 that the U.S. Supreme Court decided *J.E.M. Ag Supply, Inc. v. Pioneer Hi–Bred International, Inc.,* 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001), which held that nothing in the Plant Variety Protection Act ("PVPA") prevented utility patents from being issued for plants. By that time, the lawsuit in this case, like the one before Judge Perry in *McFarling,* had already been filed.

In *McFarling,* Judge Perry did not limit her analysis to the nine *Read* factors in denying Monsanto's motion for treble damages. While this court obviously can not speak as to her motivations in this regard, it believes that she, like this court, felt that there are unique factors present in this and similar "seed saving" cases which are not fully reflected in the *Read* factors.

The court will endeavor to discuss some of those factors now. First and foremost, the court finds, as Judge Perry did, that the legal and historical context in which the infringements in this case arose renders them far less egregious than if the same infringements were to occur today.

In her opinion in *McFarling*, Judge Perry provided an excellent discussion of the unsettled nature of some of the legal issues in this context during the late 1990's. Judge Perry also discussed how unprecedented Monsanto's marketing practices *vis a vis* its Roundup Ready seeds were at the time and how they could have reasonably been viewed by farmers with suspicion. The court will quote at length from her discussion in this regard: ·

> Monsanto's selected marketing method appears unique. Monsanto decided to charge the seed companies a relatively low license fee per bag of seed sold by the seed companies, but then to restrict the end users'—the farmers'—use of their own crops. In other words, "the Technology Agreement does not impose a restriction on the use of the product purchased under the license, but rather imposes a restriction on the use of the goods made by the licensed product." [*Monsanto Co. v.*] *McFarling II*, 363 F.3d at 1342–1343 [ (Fed.Cir.2004) ] (emphasis added). This is certainly a non-traditional licensing arrangement. Monsanto presented evidence of its reasons for choosing this marketing model, and the method was carefully chosen to increase Monsanto's revenue over·a period of years to increase its ability to recover some of its extensive research and development investment. Had Monsanto simply charged the producing seed companies a much higher one-time or per-unit royalty for their use of the technology in the product they sold, the seed companies would have had to charge farmers much higher prices for the seed. This higher price to farmers would have

undoubtedly slowed the success of the product. When the modified seed was new, it is unlikely that farmers would have been willing to pay a significant premium for the modified seed, and Monsanto's marketing studies confirmed this. Further, any farmers who were willing to pay the higher premium would probably have chosen to do so only once, and would have saved and replanted their seed. This would have caused Monsanto to lose control of its technology, which it legitimately did not want to do. **The marketing model certainly makes sense from Monsanto's perspective, but it is understandable that farmers found it suspicious.**

*McFarling*, 2005 WL 1490051 at *4 (emphasis added).

In its brief, Monsanto discusses at length the disclosures and legal warnings which it provided to farmers in its Roundup Ready marketing campaign in the 1990's. As noted by Judge Perry, however, it was impossible for Monsanto to "clarify" legal issues which had not been definitively resolved by the U.S. Supreme Court at the time. Moreover, the aggressive nature of Monsanto's marketing campaign clearly led to a great deal of suspicion among certain farmers, and, like Judge Perry, the court finds this adverse reaction to be a predictable one. Mr. Scruggs clearly had a highly negative reaction to Monsanto's campaign, and his reaction appears to be based largely upon his personal characteristics and history.

The son of a sharecropper, Mr. Scruggs is a man of limited education who, over the course of a lifetime of hard work, built a successful farm business. Scruggs appears to be a rather independent individual who does not like being told how to run his farm and business. These are not unusual traits in a farmer, and they appear to have contributed to his very poor decision to infringe upon Monsanto's patents in this

case. The court does not doubt that there was an element of financial self-interest motivating Scruggs' actions in this case, and many of his stated views regarding traditional farming practices can be regarded as convenient ones. At the same time, Scruggs' actions in this case do not strike this court as being consistent with an individual who believed that he was simply acting as a thief.

Scruggs put himself at the forefront of a national "Save Our Seed" campaign which sought to exert public and consumer pressure against Monsanto and relevant public policymakers on the seed patent issue. The court considers it unlikely that Scruggs would have assumed such a role if he did not genuinely believe that what he was doing was right, if not in a strict legal sense, then at least in a broader sense. Moreover, on a human level, the court finds it understandable that a farmer would feel some sort of natural claim to seeds which sprout from the land which he owns.

Legally speaking, there appears to be little difference between a farmer who saves and resells patented seeds grown on his land and an individual who copies and re-sells a copyrighted computer program which he bought at a store. The fact that one product comes from the ground, and the other from a computer's hard drive, makes little difference in the eyes of the law. Nevertheless, on a human level, the court can understand why a farmer would have genuinely believed that such a difference existed, or should be recognized to exist. At the time he committed the infringement in this case, it is not unreasonable that Scruggs would have thought that the still-evolving laws regarding seed saving practices could be interpreted in a manner favorable to him or that Monsanto might be pressured to enforce those laws in a less uncompromising manner. This court does not regard Scruggs' views re-garding seed saving as being analogous to, say, the tax protesters who willingly convince themselves that they need not pay federal income tax based upon some frivolous reading of the Constitution.

The U.S. Supreme Court considered the issue of whether the PVPA prevented utility patents from being issued for plants to be a serious enough one that it granted *certiorari* on the issue in the 2001 *J.E.M.* decision. The fact that the court concluded that it did not does not alter the fact that the issue was still being seriously contested at the time of Scruggs' infringement in this case. With the benefit of hindsight, it is now known that Monsanto is implacably opposed to any saving of its patented seeds by farmers, and it has not shrunk from repeatedly—and successfully—suing farmers who saved its patented seeds. The court understands Monsanto's reasons for adopting this position, since its research and investment will have been for naught if farmers are simply allowed to re-plant or re-sell its patented seeds without paying for them. At the time of his infringement, however, it does not seem unreasonable for Scruggs to have believed that the law might be found to be on his side or that, failing such, he might be able to marshal sufficient support among farmers and policymakers to persuade Monsanto to adopt a more accommodating approach in this context.

The court can also not ignore the extremely heavy personal toll which this litigation has taken on Scruggs. The court does not doubt that Monsanto has the law on its side, nor does it doubt that it acted properly in seeking to enforce that law. At the same time, Monsanto's litigation strategy in enforcing its patent rights in this case can only be described as relentless. If this case were a boxing match, then Mr. Scruggs would presently find himself unconscious on the floor of the ring, with Monsanto standing victorious

above him. Scruggs has already paid an enormous financial and personal toll for the mistakes which he has made, and the court finds the argument that he has not already been "taught a lesson" to be highly suspect.

The question before the court is not whether Mr. Scruggs should be punished for his mistakes, but, rather, whether he should be financially ruined for them. The question is also whether a lifetime of hard work and successful businesses employing numerous Mississippians should be put at risk. From reviewing Scruggs' actions in this case, the still-evolving laws which existed at the time, and the verdict already imposed, this court has no doubt that the imposition of $27 million in additional damages would be unjust. Having discussed the more generalized factors which lead it to conclude that awarding treble damages would be unjust in this case, this court will now expressly consider the *Read* factors.

With regard to virtually all of the *Read* factors, this court finds a certain degree of reprehensibility to Scruggs' actions in this case. At the same time, the court also finds, with regard to each of these factors, mitigating factors which counsel against an award of treble damages. Accordingly, even if the court were to limit its analysis solely to the *Read* factors, it would still conclude (albeit more narrowly) that treble damages should not be awarded in this case.

(1) *whether the infringer deliberately copied the ideas or design of another;*

(2) *whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;*

The court will consider the first two *Read* factors together, since they are in-ter-related in this case. The court finds that Scruggs knew that the seeds he grew and sold were subject to Monsanto's patents, and he was clearly aware of Monsanto's position that the PVPA did not preclude those patents. At the same time, the U.S. Supreme Court did not definitely resolve this issue until after the infringing conduct in this case had already occurred. From reviewing the record, the court concludes that Scruggs genuinely believed that he had a legitimate argument that he was not acting unlawfully in this case. Considered as a whole, the court does not find that the first two *Read* factors support an award of treble damages.

(3) *the infringer's behavior as a party to the litigation;*

The court does not find that Scruggs engaged in conduct in this litigation which supports an award of treble damages. At worst, the court finds a certain slipperiness on his part arising from an evident unwillingness to clearly and unambiguously admit up front that he had grown and sold Monsanto's patented seeds. At the same time, the court finds Monsanto's arguments in this context to be rather exaggerated, such as its argument that motions for reconsideration filed by Scruggs are supportive of treble damages. This has been an aggressively litigated case, on both sides, but the court does not find misconduct on Scruggs' part in this case which would support an award of treble damages.

(4) *defendant's size and financial condition;*

The court finds that an award of almost $27 million in treble damages, over and above the $8.9 million in compensatory damages already awarded by the jury,

would place the viability of defendants' legitimate and non-infringing businesses at serious risk. The evidence in the record is somewhat unclear regarding whether defendants would be completely "wiped out" financially by an award of treble damages, but, regardless, the court finds that an award of treble damages would be excessive, particularly considering the large amount of compensatory damages already awarded by the jury.

#### (5) closeness of the case;

As discussed above, the court finds that, at the time the infringement in this case actually occurred, the patentability of trait-bearing seeds was still an open legal question. While this issue was ultimately resolved against Scruggs, the fact that the U.S. Supreme Court saw fit to address it leads the court to conclude that it was a reasonably close issue at the time.

#### (6) duration of the defendant's misconduct;

The court finds that the infringement in this case lasted approximately three years, all of which was before the U.S. Supreme Court clarified the law in this context. The court does not find this duration to be particularly supportive of either party's arguments regarding whether treble damages should be awarded in this case.

#### (7) remedial action by the defendant;

The court does not find that Scruggs engaged in remedial efforts, although, by the same token, there is no indication that he continued to violate patent laws after he was judicially ordered not to do so.

#### (8) defendant's motivation for harm; and

This court has previously discussed its impressions regarding Scruggs' subjective motivations for his actions. To reiterate,

the court does not doubt that there was an element of financial self-interest motivating Scruggs' actions in this case, but it finds that his actions were also motivated by a sincere belief that he had a legitimate argument that he was acting lawfully.

#### (9) whether defendant attempted to conceal its misconduct.

■ As noted above, the court finds a certain slipperiness on the part of Scruggs in refusing to clearly and unambiguously admit that he had grown and sold Monsanto's patented seeds. For example, when asked in a deposition whether the seeds which he planted on his land were Monsanto's patented seeds, Scruggs responded that they were "Roundup resistant" seeds. This was an ambiguous response within the context of this litigation, considering that Scruggs had previously maintained that seeds on his land had developed a natural resistance to Roundup herbicide. This response was typical of Scruggs' defense of this case, where he frequently displayed what appeared to be tactics of deliberate ambiguity, but not outright deceit. In the court's view, Scruggs would have been better served by simply admitting in clear terms that the seeds which he planted and sold were, in fact, Monsanto's patented seeds. At the same time, however, the court does not regard Scruggs' conduct in this case as involving an affirmative concealment of his misconduct such as to support an award of treble damages.

The court's conclusion that the awarding of treble damages and/or attorneys fees is unwarranted is also supported by the Federal Circuit's recent decision in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003 (Fed.Cir. 2012). In *Bard*, the Federal Circuit held that the threshold objective prong of the willfulness standard enunciated in *In re Seagate Technology, LLC*, 497 F.3d 1360

(Fed.Cir.2007) (en banc) is a question of law based on underlying mixed questions of law and fact and is subject to de *novo* review. In *Seagate*, the Federal Circuit had previously established a two-pronged test for establishing the recklessness required to support an award of treble damages and/or attorneys' fees in patent cases. Under *Seagate*, to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. Once the "threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk ... was either known or so obvious that it should have been known to the accused infringer." *Id.*

■■■ In *Bard*, the Federal Circuit clarified that:

> After reviewing the Supreme Court's precedent in similar contexts, as well as our own, we conclude that simply stating that willfulness is a question of fact oversimplifies the issue. While the ultimate question of willfulness based on an assessment of the second prong of Seagate may be a question of fact, *Seagate* also requires a threshold determination of objective recklessness. That determination entails an objective assessment of potential defenses based on the risk presented by the patent. Those defenses may include questions of infringement but also can be expected in almost every case to entail questions of validity that are not necessarily dependent on the factual circumstances of the particular party accused of infringement.

Based on this standard, the court finds that the unique legal and historical context in which this case arose, in particular the prior lack of legal clarity regarding the patentability of trait-bearing seeds, supports a conclusion that Scruggs did not "act[ ] despite an objectively high likelihood that [his] actions constituted infringement of a valid patent." This court has already discussed at length above its reasons for reaching this conclusion, and this issue is clearly one which a court is in a better position to understand than a jury. Accordingly, while this court is reluctant to overturn the jury's findings of fact regarding a trial which it did not witness, it concludes, in light of *Bard*, that the question of willfulness is partially one of law. The court further concludes that Scruggs did not act with objective recklessness in this case to support a finding of willfulness, since, at the time of the infringement in the case, the law in this context had not been definitively resolved.

In light of the foregoing, the court agrees with Scruggs, in light of *Bard*, that the jury's finding of willfulness must be set aside. It appears to this court that this ruling is somewhat cumulative, since, in *McFarling*, Judge Perry concluded that treble damages were unwarranted even without setting aside the jury's finding of willfulness. Still, *Bard* makes the result in this regard even clearer than in was in *McFarling*, and it appears to this court that the Federal Circuit's recent decision is based upon a recognition that there may be additional factors relevant to the award of treble damages other than those set forth in the *Read* factors.

## CONCLUSION

The nine *Read* factors discussed above suggest that the issue of whether treble damages should be awarded in this case is a close call. On a more general equitable level, however, the court does not regard it as being a close call at all. The court has before it an individual in Mr. Scruggs who, in the late 1990's, made a serious mistake by continuing to farm and sell seeds in the

manner in which he had done his whole life. However, he did so in a time period before Monsanto's legal rights had been definitively established, and he obviously felt on a personal level that the traditional practice of seed saving was one which the law should uphold.

Given the historical and legal context of Monsanto's aggressive Roundup Ready marketing campaign, the court finds it virtually inevitable, as Judge Perry did in *McFarling*, that a certain segment of the farming community would have rebelled against it. It has now been clearly established that Scruggs' resistance to Monsanto's marketing and licensing campaign was not grounded in sound legal principles, but he did not know at the time that this was the case. It is certainly arguable that Scruggs acted naively in opposing Monsanto's campaign, and he would have been well advised to secure legal advice from counsel before doing so. However, the court would find his actions to be more reprehensible if he had acted against specific legal advice from counsel.

Now, in light of the jury's imposition of almost $9 million in actual damages, Mr. Scruggs has already been subjected to a verdict which the court finds to be in the upper range of damages which the jury might reasonably have awarded. The law instructs the court that this $8.9 million verdict is merely compensatory in nature, but, on a human level, it is clearly a staggering financial blow. Even if one accepts the notion that Scruggs' conduct in this case was egregious (which this court does not), it does not believe that the imposition of almost 27 million dollars in additional damages is necessary in order to punish him. The court does not believe that Scruggs should be spared the legal consequences of his actions in this case, but it

likewise does not believe that he should be subjected to the harshest and most punitive sanctions which patent law can impose.

In light of the foregoing, the court will deny the defendants' motion [912–1] for new trial, JMOL and/or remittitur in part, and it will likewise deny Monsanto's motion [931–1] for treble damages and/or attorneys' fees. The court reserves judgment on the portion of Scruggs' motion for new trial, JMOL and/or remittitur which is based on alleged errors in the form of the verdict, pending additional briefing from the parties on this issue.[2] Defendants' motions to supplement the record [986–1] and to apply controlling law on willfulness [983–1] are granted, and their motion for sequencing of consideration of issues [979–1] is granted.

---

2. The court will deal with the issue of prejudgment interest, and any other remaining issues, in its final order resolving the posttrial issues in this case.