**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GARY KING, as personal
representative of Linda King,
*Plaintiff-Appellant*,

v.

BLUE CROSS AND BLUE SHIELD OF
ILLINOIS; UNITED PARCEL SERVICE
OF AMERICA, INC.; UPS HEALTH
AND WELFARE PLAN FOR RETIRED
EMPLOYEES; DOES, 1 through 10,
*Defendants-Appellees.*

No. 15-55880

D.C. No.
3:13-cv-01254-
CAB-JMA

OPINION

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted March 9, 2017
Pasadena, California

Filed September 8, 2017

Before: Richard A. Paez, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Employee Retirement Income Security Act

The panel reversed the district court's grant of summary judgment in favor of the defendants in an ERISA action regarding the denial of a welfare benefit plan participant's claim for medical benefits on the basis of the plan's lifetime benefit maximum.

The panel held that ERISA, as amended by the Patient Protection and Affordable Care Act, does not ban lifetime benefit maximums for certain retiree-only plans.

The panel held that the defendants violated ERISA's statutory and regulatory disclosure requirements by providing a faulty summary of material modifications describing changes to the lifetime benefit maximum. The panel concluded that the summary did not reasonably apprise the average plan participant that the lifetime benefit maximum continued to apply to the retiree plan.

The panel also held that genuine disputes of material fact precluded summary judgment on claims of breach of fiduciary duty in the failure to comply with ERISA's disclosure requirements. The panel held that a defendant claims administrator was a fiduciary because it had authority

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to grant, deny, and review benefits claims, and there was a genuine dispute of material fact about whether this defendant misled the ERISA plan participant.

The panel remanded the case to the district court.

## COUNSEL

Patrick A. Calhoon (argued) and Craig A. Miller, Law Offices of Craig A. Miller, San Diego, California, for Plaintiff-Appellant.

Eileen R. Ridley (argued) and Alan R. Ouellette, Foley & Lardner LLP San Francisco, California, for Defendant-Appellee Blue Cross and Blue Shield of Illinois.

John Timothy McDonald (argued) and Sedric D. Bailey, Thompson Hine LLP, Atlanta, Georgia, for Defendants-Appellees United Parcel Service of America, Inc., and UPS Health and Welfare Plan for Retired Employees.

**OPINION**

CHRISTEN, Circuit Judge:

Linda King participated in a welfare benefit plan that the defendants sponsored and administered. In November 2012, Mrs. King suffered a back infection that required immediate surgery and extensive post-surgery rehabilitative care. After initially approving her treatment as medically necessary, the defendants denied her claim for benefits because Mrs. King exceeded her plan's $500,000 lifetime benefit maximum.

Mrs. King filed suit against the defendants—Blue Cross and Blue Shield of Illinois, United Parcel Service of America, Inc. (UPS), the UPS Health and Welfare Plan for Retired Employees, and Does 1 through 10—under the Employment Retirement Income Security Act of 1974 (ERISA). She sought declaratory relief and alleged breach of contract and breach of fiduciary duties. Mrs. King passed away while her suit was pending before the district court and Mr. King was substituted as the representative of her estate. In response to the defendants' motions for summary judgment, Mr. King argued that the defendants failed to adequately disclose that the lifetime benefit maximum applied to the plan. The district court granted summary judgment to the defendants, and Mr. King appeals.

We hold: (1) that ERISA, as amended by the Affordable Care Act, does not ban lifetime benefit maximums for certain retiree-only plans; (2) that the defendants violated ERISA's statutory and regulatory disclosure requirements by providing a faulty summary of material modifications describing changes to the lifetime benefit maximum in September 2010; and (3) that genuine disputes of material fact preclude

summary judgment on the breach of fiduciary duty claims. Accordingly, we reverse the district court's order granting summary judgment.

## BACKGROUND

### I.  The UPS Health and Welfare Package for Retired Employees

UPS administers two employee welfare benefit plans governed by ERISA: (1) the UPS Health and Welfare Package for active employees (the Employee Plan); and (2) the UPS Health and Welfare Package for Retired Employees (the Retiree Plan).  UPS is the Plan Administrator and Plan Sponsor.  Blue Cross is a claims administrator for medical coverage under the plans.

Mrs. King became a participant in the self-funded Retiree Plan as a covered dependent when her husband retired from UPS in March 2011.  The Retiree Plan offers medical, dental, and vision coverage for eligible retired employees, their spouses, and their dependent children.  Coverage under the Retiree Plan begins at retirement and ends when the retiree or covered dependent turns sixty-five and becomes eligible for Medicare.

### A.  The Summary Plan Description

The Retiree Plan's substantive benefit provisions are explained in the Summary Plan Description (SPD), which the Retiree Plan Document incorporates by reference.  The SPD governs both the Employee Plan and the Retiree Plan, and is comprised of two parts: (1) the 2006 SPD and (2) a series of summaries of material modifications describing amendments

to the plans that have been adopted since 2006.[1]  The 2006 SPD is ninety-six pages and has nineteen sections on topics such as "If a Claim is Denied," "Retired Employee Health Care Coverage," and "ERISA and Other Important Information."  The table of contents lists the nineteen sections, but does not refer to any of the amendments that appear in the summaries of material modifications.

UPS issued twelve such summaries between May 2006 and December 2012.  Each summary indicates the month and year it was issued and whether it modifies one or both of the plans.  UPS instructs plan participants to keep the summaries with the 2006 SPD for future reference.  The summaries vary between one and four pages in length, and total twenty-five pages all together.  They are not cumulative; each summary of material modifications describes only newly announced amendments.  Thus, to determine the current language for each benefit provision, a plan participant must read the relevant section from the 2006 SPD and then read all twelve summaries of the plan modifications.

## B.  The Lifetime Benefit Maximum

The Employee Plan and Retiree Plan originally contained different lifetime benefit caps on medical coverage.  The 2006 SPD section titled "Retired Employee Health Care Coverage" explains:  "There is a new lifetime maximum that begins when you retire and become eligible for benefits from the UPS Health and Welfare Package for Retired

---

[1] ERISA requires plan administrators to provide beneficiaries with both a summary plan description and summaries of any material modifications made to the plan.  *See* 29 U.S.C. §§ 1022(a), 1024(b)(1).

Employees." On the next page, under the subheading "The Lifetime Benefit Maximum," the SPD states:

> Up to $500,000 in lifetime medical benefits (unlimited in HMO Option) can be paid for each person participating in the UPS Health and Welfare Package for Retired Employees. Only benefits paid while you receive coverage as a retired employee count toward the $500,000 total. . . . Each January, up to $1,000 in individual benefits paid during the preceding year will automatically be restored.

In an earlier section titled "Medical," the SPD explains that the Employee Plan has a $1 million lifetime maximum. In September 2010, however, UPS issued a summary of material modifications (the 2010 Summary of Modifications) that eliminated the Employee Plan's lifetime benefit cap in response to the Patient Protection and Affordable Care Act (the Affordable Care Act). The 2010 Summary of Modifications provided that this amendment would become effective on January 1, 2011. The parties dispute whether this modification also applies to the Retiree Plan.

## C. The 2010 Summary of Modifications[2]

The 2010 Summary of Modifications included amendments to both the Employee Plan and the Retiree Plan. At the top of the first page, the 2010 Summary of Modifications states, in italicized font:

---

[2] See the Appendix for a copy of the 2010 Summary of Modifications.

*This notice details Plan improvements, changes, clarifications, and required notifications effective January 1, 2011, unless otherwise noted. Items noted with an asterisk (\*) do not apply to retirees or their covered dependents. You should keep this with your UPS Health and Welfare Package and UPS Health and Welfare Package for Retired Employees Summary Plan Description for future reference.*

Directly under this text, the page divides into two columns. At the top of the column on the left-hand side of the page, there is a single-spaced paragraph of text titled "Health Care Reform\*" in bold.  Below the title, this paragraph states:

In March, President Obama signed into law the Patient Protection and Affordable Care Act (PPACA), also known as "health care reform." Effective January 1, 2011, PPACA requires the following changes to your UPS-administered health care plan. If the PPACA provisions requiring these Plan changes are ever repealed, the changes made solely as a result of PPACA will be terminated and the provisions of the Plan modified by PPACA will be reinstated effective the date the law is repealed.

Immediately below this paragraph is another bold heading, which states "Grandfather Plan Status," followed by two paragraphs of single-spaced text.  After these two paragraphs, there is a third bold heading in the left column, which states "Dependent Children Under Age 26," followed by five

paragraphs of single-spaced text.  The text under this heading continues from the bottom of the column on the left-hand side of the first page to the column on the right-hand side of the first page, and onto the second page.  On the second page, approximately one-third of the way down the left column, there is a fourth bold heading, which states "Elimination of Lifetime Maximum Benefits."  This section contains one paragraph of single-spaced text:

> Lifetime dollar limits on aggregate benefits will be eliminated from your Plan effective January 1, 2011.  If you are an otherwise eligible employee whose coverage previously ended upon reaching your lifetime maximum benefit under the Plan, you will have 30 days, beginning the first day of the annual enrollment period, to re-enroll in the Plan.  If you choose to enroll, your coverage is effective January 1, 2011 (as long as you continue to meet the Plan's eligibility requirements).  You may also enroll any dependents whose coverage ended upon reaching their lifetime maximum.

Upon very close inspection, one can discern that the "Health Care Reform*" heading at the top of the first page is in a different font type than the three headings that follow, including "Elimination of Lifetime Maximum Benefits." According to the defendants, the "Health Care Reform*" heading is in Arial font, while the other headings are in Times New Roman, and the Arial heading is in a larger font size. The differences in font type and size are difficult to discern.

After the "Elimination of Lifetime Maximum Benefits" section, the 2010 Summary of Modifications has three more bold headings in Times New Roman font with corresponding paragraphs of text. This text wraps from the column on the left-hand side of the second page into the column on the right-hand side. One-third of the way down the right column, there is another bold heading in Arial font: "Mental Health Parity." This heading is followed by two more bold headings in Times New Roman font on the second page. On the third page, there are three bold headings in Arial font. None of the other headings in the 2010 Summary of Modifications besides "Health Care Reform*" contains an asterisk.

## II. Plan Administration and Claim Appeals Process

The 2006 SPD grants UPS as Plan Administrator "the exclusive right and discretion to interpret the terms and conditions of the Plan, and to decide all matters arising in its administration and operation, including questions of fact and issues pertaining to eligibility for, and the amount of, benefits to be paid by the Plans."[3] The 2006 SPD nonetheless authorizes UPS "to delegate its administrative duties to one or more individuals or committees within UPS, or to one or more outside administrative services providers." It elaborates that "[p]resently, certain administrative services with regard to the processing of claims and the payment of benefits are provided under contract," including a contract with Blue

---

[3] The SPD further states: "Any such interpretation or decision shall, subject to the claims procedure described herein, be conclusive and binding on all interested persons, and shall, consistent with the Plans' terms and conditions, be applied in a uniform manner to all similarly situated participants and their covered dependents. The Plan Administrator may delegate certain discretionary authority to one or more committees."

Cross to administer medical coverage for some plan participants.

The 2006 SPD describes a two-level appeals process for denied benefit claims.  Upon receiving written notice from the claims administrator that a claim is denied, the participant has 180 days to file a first-level appeal with the claims administrator (*i.e.*, Blue Cross).  If the claims administrator denies the claim again, the participant has 60 days to file a second-level appeal with the UPS Claims Review Committee (CRC).  UPS delegated its discretion to interpret the plan to the CRC.

### III.    Linda King's Medical Claim

In the fall of 2012, Linda King suffered an infection that caused the destruction of several vertebrae and necessitated immediate back surgery and extensive rehabilitative care. The record reflects that Mrs. King or her care providers reached out to Blue Cross to obtain precertification for her treatment starting in November 2012.  The 2006 SPD describes "precertification" as a process to ensure that hospital stays, convalescent facility stays, home health care services, and hospice services are "medically necessary and appropriate."  Plan participants and their treating physicians are notified by mail of the certification decision and participants are charged a $250 fee for the failure to precertify, but the 2006 SPD does not warn that even if a plan participant obtains precertification, the plan or claims administrator may still deny benefit claims for other reasons.

The record contains a series of letters from Blue Cross to Mrs. King dated between November 28, 2012 and February 11, 2013.  The letters approve medical care at several

hospitals and other facilities provided between November 7, 2012 and March 13, 2013. The letters all state that they are "in response to a request for service(s)/procedure(s)," and certify specific treatment as "medically necessary." The dates on the letters indicate that in some cases the letters were sent after the approved care occurred. All the letters contain the following qualification:

> Approval through the Health Care Management Department is not a guarantee of payment of benefits. Payment of benefits is subject to several factors, including, but not limited to, eligibility at the time of service, payment of premiums/contributions, amounts allowable for services, supporting medical documentation and other terms, conditions, limitations and exclusions set forth in your . . . Summary Plan Description . . . . For questions regarding benefits, please contact the Customer Service unit at the telephone number listed on the back of your health insurance card. You remain responsible for any out-of-pocket requirements, including, but not limited to, coinsurance, copayments, deductibles and/or non-covered charges.

On February 19, 2013, Blue Cross sent Mrs. King an explanation of benefits stating that only $133,601.41 of $949,755 billed for medical care was covered by her plan because she had reached the lifetime benefit maximum. The explanation of benefits stated that Mrs. King may owe Scripps Memorial Hospital $578,551.34 for care provided

between November 2–28, 2012.**[4]**  Because the February 19 explanation of benefits indicated that Mrs. King reached her plan's lifetime benefit maximum in November 2012, it also suggested that the plan would not cover the cost of care that had already been provided between December 2012 and February 2013.

In response, Mrs. King sent a letter to the Blue Cross Claims Review Section on March 14, 2013.  The letter explained: (1) the explanation of benefits was the first written notice Mrs. King received that her health insurance would not cover all her medical bills; (2) the defendants had assured Mrs. King and her husband that her health benefits had no limit;**[5]** (3) she had a telephone conversation with a Blue Cross representative about an unrelated issue during the last week of January 2013 in which the representative mentioned for the first time that she was only $10,000 away from the lifetime maximum; (4) after this conversation, Mrs. King immediately purchased health insurance through her employment, effective February 1, 2013; and (5) Mrs. King discharged herself from a rehabilitation facility against medical advice on February 9, 2013 out of concern that the care she received would not be covered by the Retiree Plan.  Mrs. King asked

---

**[4]** The explanation of benefits does not explain the discrepancy between the $816,153.59 in charges for care not covered by the plan and the $578,551.34 that Mrs. King may owe her provider.

**[5]** The letter does not specify which defendants assured Mrs. King and her husband that her benefits had no limit.  The letter states: "Both Blue Cross and UPS have mislead [sic] us.  My husband was assured that our health benefits had no limit.  I was reassured this was the case at least weekly by case managers who spoke with Blue Cross."  Mrs. King passed away in December 2014, and there is no declaration from her in the record.  Mr. King's declaration does not mention these assurances.

Blue Cross to "review these facts and advise of your decision." Also on March 14, 2013, Blue Cross sent another letter to Mrs. King announcing that she had reached the lifetime maximum, but this letter informed her that the limit was reached on January 1, 2013.

## IV.   The Instant Litigation

On May 30, 2013, Mrs. King filed suit against the defendants under sections 502(a)(1)(B) and 502(a)(3) of ERISA. *See* 29 U.S.C. § 1132(a)(1)(B), (a)(3). On June 3, 2013, Mrs. King's counsel sent a letter to the CRC stating that UPS had wrongfully imposed the $500,000 lifetime benefit maximum, noting that Blue Cross did not respond to Mrs. King's first-level appeal, and including a copy of her March 14 letter and the district court complaint. The letter asked that UPS "immediately reconsider" its decision to impose the lifetime benefit maximum. On July 10, 2013, Blue Cross denied the first-level appeal, concluding that the lifetime benefit cap applied to the Retiree Plan.

Mrs. King filed a first amended complaint on September 9, 2013. In it, she sought declaratory relief and alleged that the defendants breached the Retiree Plan contract and their fiduciary duties in violation of ERISA. The defendants moved to dismiss, arguing that the 2010 Summary of Modifications did not eliminate the lifetime benefit maximum in the Retiree Plan.

The district court denied the motion to dismiss. It ruled that the 2010 Summary of Modifications was ambiguous as to whether the Retiree Plan was subject to a lifetime benefit maximum, that both parties' interpretations of the 2010 Summary of Modifications were "reasonable," and that "the

distinction in font type without more, such as indentation of the subheadings, numbering, or different sized text may not even alert the average plan participant that the Arial headings are 'major headings' and that the Times New Roman headings are subheadings within each major heading."

Subsequently, the CRC notified Mrs. King that the second-level review of her claim was "not favorable."  The CRC emphasized the italicized disclaimer at the top of the 2010 Summary of Modifications' first page, which states, "Items noted with an asterisk (*) do not apply to retirees or their covered dependents."  The CRC reasoned that the word "items" does not mean "paragraphs," suggesting that the asterisk after the "Health Care Reform*" heading refers to more than just the one paragraph immediately below the heading.

The CRC also stressed that the sole paragraph under the "Health Care Reform*" heading states that the Affordable Care Act "requires the following changes to your UPS-administered health care plan."  The CRC reasoned that because there are no changes contained in that paragraph itself, the heading must refer to paragraphs that follow.  The CRC noted that all the subsequent paragraphs describe required changes under the Affordable Care Act until the "Mental Health Parity" heading on the second page, and concluded that because the "Health Care Reform*" and "Mental Health Parity" headings are in a different font type and size, all the text between these headings constitutes a single "item."   Under the CRC's interpretation, the "Elimination of Lifetime Maximum Benefits" paragraph is part of the larger "Health Care Reform*" item and the asterisk indicates that the elimination of lifetime benefit

maximums does *not* apply to retirees or their covered dependents.

On October 23, 2014, the defendants moved for summary judgment. Roughly two months later, Mrs. King passed away and Mr. King was substituted as the representative of Mrs. King's estate. The district court thereafter granted summary judgment to the defendants, ruling that: (1) the plan administrator did not abuse its discretion by interpreting the Retiree Plan to include a lifetime benefit maximum; (2) the reasonable expectations doctrine does not apply to self-funded welfare benefit plans; (3) the Affordable Care Act did not amend ERISA to ban lifetime benefit caps for retiree-only plans; and (4) the defendants did not breach their fiduciary duties to Mrs. King. The district court did not address Mr. King's argument that the 2010 Summary of Modifications violates ERISA's disclosure requirements. Mr. King timely appealed.

## STANDARDS OF REVIEW

"We review de novo a district court's grant of summary judgment." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1288 (9th Cir. 2014). "The interpretation of a federal statute . . . is a question of law, and we review it *de novo*." *Arnold v. Arrow Transp. Co. of Del.*, 926 F.2d 782, 785 (9th Cir. 1991). With respect to the breach of fiduciary duty claims, the court "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Farr v. U.S. W. Commc'ns, Inc.*, 151 F.3d 908, 913–14 (9th Cir. 1998).

## DISCUSSION

### I.   ERISA's Ban on Lifetime Benefit Maximums

We first consider whether ERISA, as amended by the Affordable Care Act, bans lifetime benefit maximums in retiree-only plans for if it does, there would be no need to reach plaintiff's other claims.  We conclude that it does not.

The Affordable Care Act amended both the Public Health Service Act (PHSA) and ERISA.  The amendment to the PHSA states, in relevant part:  "A group health plan and a health insurance issuer offering group or individual health insurance coverage may not establish . . . lifetime limits on the dollar value of benefits for any participant or beneficiary. . . ."   42 U.S.C. § 300gg-11(a)(1).   The Affordable Care Act added a clause to ERISA that states, subject to exceptions not relevant here, "[T]he provisions of part A of title XXVII of the Public Health Service Act (as amended by the Patient Protection and Affordable Care Act) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, *as if included in this subpart*. . . ."  29 U.S.C. § 1185d(a)(1) (emphasis supplied).  These provisions include the ban on lifetime benefit limits.  Read in isolation, this suggests that the Affordable Care Act incorporated the PHSA's ban on lifetime benefit limits into ERISA.

Section 732 of ERISA, however, creates an exception for certain retiree-only plans.  This exception, which predates the Affordable Care Act, states:  "The requirements of this part (other than section 1185 of this title) shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) for any plan

year if, on the first day of such plan year, such plan has less than 2 participants who are current employees." 29 U.S.C. § 1191a(a). The parties do not dispute that the Retiree Plan at issue is such a plan.

The plaintiff argues, however, that this ERISA exception has been impliedly repealed by the Affordable Care Act's amendments to the PHSA which not only introduced a ban on lifetime benefit limits, but also eliminated a similar exception for certain retiree-only plans. Pub. L. No. 110-2, 121 Stat. 4.

The Supreme Court "has repeatedly stated . . . that absent a clearly expressed congressional intention, repeals by implication are not favored." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citations omitted) (internal quotation marks omitted). "An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Id.* Irreconcilable conflict occurs if "there is a positive repugnancy" between competing provisions or if those provisions cannot "mutually co-exist." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Id.*

The plaintiff submits that there is an "irreconcilable conflict" between the ban on lifetime benefit limits in the PHSA and the exception for retiree plans in ERISA. But "[i]t is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem." *Id*. Courts "ha[ve] not hesitated to give effect to two statutes that overlap, so long as

each reaches some distinct cases." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 731 (7th Cir. 2004) ("Whether overlapping and not entirely congruent remedial systems can coexist is a question with a long history at the Supreme Court, and an established answer: yes."). Although the plaintiff suggests—in a footnote in his opening brief—that the Affordable Care Act has all but eliminated the distinction between ERISA and non-ERISA plans, ERISA and the PHSA are not co-extensive in scope. For example, ERISA, unlike the PHSA, exempts governmental plans from many of its mandates. *Compare* 29 U.S.C. §§ 1002(32), 1003(b)(1), *with* 42 U.S.C. § 300gg-21(a)(1). Moreover, the plaintiff has not shown that it is impossible for sponsors, issuers, or administrators to conform to the requirements of both ERISA and the PHSA. *See Randolph*, 368 F.3d at 731 ("Overlapping statutes do not repeal one another by implication; as long as people can comply with both, then courts can enforce both."). Thus, we cannot say that the ban on lifetime benefit limits in the PHSA and the exception for certain retiree-only plans in ERISA are in irreconcilable conflict, nor conclude that the ERISA exception was impliedly repealed by the Affordable Care Act.

The district court did not err in ruling that ERISA's ban on lifetime benefit maximums does not apply to the Retiree Plan.[6]

---

[6] The Complaint and the First Amended Complaint broadly alleged that the lifetime benefit limit in the Retirement Plan was lifted by the Affordable Care Act and prayed for declaratory relief as well as relief under ERISA. Since the plaintiff's challenge did not arise under the PHSA, the district court did not rule on, among other things, whether the PHSA bans lifetime benefit limits in certain retiree-only plans. We accordingly offer no opinion as to the merits of such a claim.

**II. ERISA's Disclosure Requirements**

The plaintiff contends that the SPD, as amended by the 2010 Summary of Modifications, violates ERISA's statutory and regulatory disclosure requirements because it does not reasonably apprise the average plan participant that the lifetime benefit maximum continues to apply to the Retiree Plan.  We agree.

"ERISA's central policy goal is to protect benefit plan participants 'by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.'"  *Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 904 (9th Cir. 2009) (alteration in original) (quoting 29 U.S.C. § 1001(b)).  To further this goal, ERISA requires that benefit plans provide participants with a SPD and a "summary of any material modification in the terms of the plan."  *See* 29 U.S.C. § 1022(a).

The SPD and any summaries of material modifications must "be written in a manner calculated to be understood by the average plan participant."  *Id.*  The SPD must also "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  *Id.*  ERISA requires in particular that the SPD include any "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  *Id.* § 1022(b).  This court summarized the combined effect of these requirements in *Scharff* as:

> [T]he SPD must explain the "circumstances which may result in disqualification,

ineligibility, or denial or loss of benefits" in a manner "calculated to be understood by the average plan participant," and that information must be "sufficiently accurate and comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan.

581 F.3d at 904 (quoting 29 U.S.C. § 1022(a)–(b)).

Federal regulations provide further detail on how to fulfill ERISA's disclosure requirements:

The format of the summary plan description must not have the effect to [sic] misleading, misinforming or failing to inform participants and beneficiaries. Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. . . . The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided

that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

The plaintiff cites to *Spinedex*, 770 F.3d at 1294–95, for the proposition that benefit limitations are unenforceable if they violate ERISA's statutory and regulatory disclosure requirements. In *Spinedex*, we held that limitation provisions in two plans were unenforceable because they "were not properly disclosed in the SPDs." *Id.* at 1294. The provisions were two-year limitations periods for filing suit to challenge the denial of benefit claims under the plans at issue. *Id.* at 1295. The limitations periods were "buried deep" in the SPDs, and were "not in 'close conjunction' to benefits provisions." *Id.* *Spinedex* further noted that there was no "reference, adjacent to the benefits description, to the page number on which the 'Limitation of Action' provision appears." *Id.*

*Spinedex* explained that this court employs "a 'reasonable plan participant' standard" to analyze the disclosure requirements in 29 C.F.R. § 2520.102-2(b), and concluded that, under this standard, the court does not "require a plan beneficiary to read every provision of an SPD in order to ensure that he or she did not miss a limitation provision," because "[s]uch a requirement is what the regulation is specifically designed to avoid." 770 F.3d at 1295, 1296. The court held that the limitations periods in the *Spinedex* plans were unenforceable because they "were not disclosed in compliance with 29 C.F.R. § 2520.102-2(b)." *Id.*

The 2010 Summary of Modifications amending the SPD that governs Mrs. King's claim likewise does not satisfy ERISA's disclosure requirements because, at bottom, the document was not "written in a manner calculated to be understood by the average plan participant."   29 U.S.C. § 1022(a).

First, rather than issue an amended SPD, or even cumulative summaries of material modifications, UPS announced plan amendments in a series of summaries, all of which must be read in conjunction with the 2006 SPD to determine available benefits.[7]   The format used by UPS required plan participants to first read the 2006 SPD section titled "Retired Employee Health Care Coverage," where one would learn about the lifetime benefit maximum.  Next, the participants would have to read all twenty-five pages of the summaries of material modifications to determine whether any amendments modified the lifetime maximum.  There is no comprehensive table of contents that allows participants to verify which SPD terms have been amended by the modifications or to confirm that any particular provision has *not* been modified.  The 2006 SPD benefit provisions do not cross-reference the summaries of material modifications, and the summaries do not consistently cross-reference the 2006 SPD.  Notably, the 2010 Summary of Modifications does not cross-reference the Retiree Plan's lifetime benefit maximum.

---

[7] We note that ERISA requires UPS as Plan Administrator to issue an updated SPD every five years "which integrates all plan amendments made within such five-year period."  29 U.S.C. § 1024(b)(1)(B).  The record suggests that UPS did not comply with this requirement, because UPS did not issue an updated SPD in 2011, five years after it issued the 2006 SPD.

Furthermore, even examining the 2010 Summary of Modifications in isolation, the defendants' interpretation requires the average plan participant to read the entire document, notice the subtle shift in font type and size between the "Health Care Reform*" heading and the other headings that follow, and somehow intuit that all of the text between the "Health Care Reform*" heading on the first page and the "Mental Health Parity" heading on the second page describes required changes under the Affordable Care Act. But the fact that all of these paragraphs relate to the Affordable Care Act is not apparent from the text.[8] In fact, the "Elimination of Lifetime Maximum Benefits" paragraph does not mention the Affordable Care Act at all. That paragraph states:

> Lifetime dollar limits on aggregate benefits will be eliminated from your Plan effective January l, 2011. If you are an otherwise eligible employee whose coverage previously ended upon reaching your lifetime maximum benefit under the Plan, you will have 30 days, beginning the first day of the annual enrollment period, to re-enroll in the Plan. If you choose to enroll, your coverage is effective January l, 2011 (as long as you continue to meet the Plan's eligibility

---

[8] Nor is it apparent, or even discernable upon close examination, that the individual paragraphs between these two headings were intended to be a single "item" because the paragraphs pertain to a diverse set of topics, including "Grandfather Plan Status," "Dependent Children Under Age 26," "Elimination of Lifetime Maximum Benefits," "Elimination of Lifetime and Annual Dollar Limits for 'Essential Benefits,'" "Elimination of Pre-existing Conditions on Benefits for Children Under Age 19," and "HCSA Reimbursement of Over-the-Counter Drugs."

requirements). You may also enroll any dependents whose coverage ended upon reaching their lifetime maximum.

The effective date for the elimination of the lifetime maximum is the same date mentioned in the first paragraph under the "Health Care Reform*" heading, but other changes in the 2010 Summary of Modifications, unrelated to the Affordable Care Act, also use this effective date.

As explained, the defendants argue that the reference to "the following changes" in the "Health Care Reform*" paragraph indicates that the asterisk in the "Health Care Reform*" heading applies to all the paragraphs between the "Health Care Reform*" heading on the first page and the "Mental Health Parity" heading on the second page. But even assuming that the average Retiree Plan participant would read this paragraph (despite the asterisk in the heading which plainly states that the paragraph does *not* apply to retirees), the participant would not know how many changes are included in "the following changes." That phrase can be read to refer to just the changes in the next two paragraphs under the heading "Grandfather Plan Status," or it can be read to refer to some unknown number of additional changes.

Notably, the two "Grandfather Plan Status" paragraphs explicitly discuss the Affordable Care Act, but the next heading is "Dependent Children Under Age 26," and the five paragraphs that follow it do not refer explicitly to the Affordable Care Act at all. This organization could easily suggest to the reader that these paragraphs do not relate to the "Health Care Reform*" heading. Of the three sections that follow "Elimination of Lifetime Maximum Benefits," only

two mention the Affordable Care Act.[9]   In short, even assuming that the average plan participant would read the first paragraph—in spite of the fact that the heading with the asterisk informs the reader that it does not apply to retirees—the participant would not know how many of the following paragraphs fall within "the following changes" not applicable to the Retiree Plan.  A participant could reasonably conclude that the inapplicable changes include only the "Grandfather Plan Status" paragraphs or only those paragraphs that explicitly mention the Affordable Care Act.  Congress mandated that ERISA disclosures must be designed to prevent plan participants from having to engage in such close parsing of the text, format, and font to determine whether a benefit limitation applies to their plan.

Comparing the 2010 Summary of Modifications to the other summaries of material modifications demonstrates several ways in which UPS could have made the 2010 amendments easier for the average plan participant to understand.  First, the October 2006 Summary of Material Modifications places small subheadings directly below the larger major headings, with no intervening text, to indicate

---

[9] At oral argument, defense counsel was asked how—aside from the subtle changes in font type and size—a plan participant would know that the items associated with the "Health Care Reform\*" heading end with the "Mental Health Parity" heading.  *See* Oral Argument at 19:09–23:30, 26:20–27:00, *King v. Blue Cross & Blue Shield of Ill.*, No. 15-55880 (9th Cir. March 9, 2017), http://www.ca9.uscourts.gov/media/view_video.p hp?pk_vid=0000011172. Counsel responded that the participant would know this because the "Mental Health Parity" heading is followed by a paragraph that does not mention the Affordable Care Act.  *See id.* at 26:20–27:00.  But that is also true of the paragraph that immediately *precedes* the "Mental Health Parity" heading, titled "HCRA Reimbursement of Over-the-Counter Drugs."

that they are subheadings. The February 2007 Summary of Material Modifications uses a noticeably larger font size for the major headings. The October 2007 Summary of Material Modifications employs asterisks next to six out of ten headings in the document to indicate that all six of those sections do not apply to retirees. Better yet, in September 2012, UPS issued separate summaries of material modifications for the Employee Plan and the Retiree Plan, clearly labeled as such at the top of the first page. UPS could have used any one of these drafting strategies, among others, to make clear that the lifetime benefit maximum still applied to the Retiree Plan. The failure to do so was critical to Mrs. King, who could have obtained health insurance to cover the cost of her medical care through her own employment.

Even with the benefit of defense counsel's argument, we cannot agree that the subtle shifts in font size and use of a single asterisk on the first page of the 2010 Summary of Modifications can be described as "calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). Instead, the document obscures whether the paragraph titled "Elimination of Lifetime Maximum Benefits" applies to the Retiree Plan. For these reasons, we conclude that the SPD, as amended by the 2010 Summary of Modifications, violates ERISA's statutory and regulatory disclosure requirements. Whether the 2010 Summary of Modifications violates ERISA disclosure requirements is a distinct inquiry from whether the plan administrator abused its discretion and whether the reasonable expectations doctrine applies. *See, e.g.*, *Scharff*, 581 F.3d at 906–07; *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 407 (9th Cir. 1997). Because we conclude that the defendants' notice of the amendment to the lifetime benefit maximum violates ERISA, we do not address: (1) whether

UPS abused its discretion as Plan Administrator by interpreting the Retiree Plan to include a $500,000 lifetime benefit maximum; and (2) whether enforcing the lifetime maximum would defeat Mrs. King's reasonable expectations of coverage.

## III.    Breach of Fiduciary Duties

The plaintiff argues that UPS, the Retiree Plan, and Blue Cross breached their fiduciary duties to Mrs. King under ERISA. "ERISA requires a 'fiduciary' to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Farr*, 151 F.3d at 914 (quoting 29 U.S.C. § 1104(a)). "The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose." *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823 (9th Cir. 2007) (internal citation omitted) (footnote omitted). "A fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995). "[F]iduciaries breach their duties if they mislead plan participants or misrepresent the terms or administration of a plan." *Id.*

### A.   UPS and the Retiree Plan

The plaintiff argues that UPS and the Retiree Plan breached their fiduciary duties to Mrs. King by failing to comply with ERISA's disclosure requirements. More specifically, the plaintiff maintains that the 2010 Summary of Modifications misled Mrs. King "into understanding that

there was no lifetime cap on her plan." UPS and the Retiree Plan contend that this claim must fail because: (1) the Retiree Plan is not ambiguous with respect to whether the lifetime benefit maximum applies to Mrs. King's claims; and (2) neither UPS nor the Retiree Plan misrepresented this fact to Mrs. King. The district court granted summary judgment to the defendants. Because the SPD, as amended by the 2010 Summary of Modifications, does not comply with the relevant statutory and regulatory disclosure requirements, the district court erred by granting summary judgment to UPS and the Retiree Plan on the breach of fiduciary duty claims.

UPS and the Retiree Plan had a duty to "provide sufficiently detailed information" about whether the lifetime benefit maximum applied to the Retiree Plan after the September 2010 amendments. *See Farr*, 151 F.3d at 915. As we have explained, the 2010 Summary of Modifications failed to alert retirees and their covered dependents that, despite the defendants' announcement that the lifetime cap would no longer apply to the Employee Plan, the defendants intended that the lifetime maximum still apply to the Retiree Plan. Therefore, we reverse the district court's order granting summary judgment to UPS and the Retiree Plan on the breach of fiduciary duty claims.

## B. Blue Cross

The plaintiff next argues that issues of material fact preclude summary judgment on the breach of fiduciary duty claim against the claims administrator Blue Cross. Blue Cross responds that: (1) it does not qualify as an ERISA fiduciary; and (2) it did not "provide inaccurate or misleading information regarding the terms of Mrs. King's benefit plan." The district court ruled that Blue Cross is not an ERISA

fiduciary and that Blue Cross did not make any misrepresentations to the plaintiff. We respectfully disagree.

### 1. Fiduciary Status

As relevant here, ERISA defines a "fiduciary with respect to a plan" to include a person who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). The Department of Labor's "questions and answers" relating to fiduciary responsibility under ERISA explain that agents or employees who perform "purely ministerial functions" do not qualify as fiduciaries, 29 C.F.R. § 2509.75-8, at D-2; neither do agents "whose sole function is to calculate the amount of benefits to which each plan participant is entitled in accordance with a mathematical formula," *id.* at D-3. On the other end of the spectrum, an agent "who has the final authority to authorize or disallow benefit payments in cases where a dispute exists" is a fiduciary. *Id.* Blue Cross argues that it is not a fiduciary because the SPD states that UPS has "the exclusive right and discretion to interpret the terms and conditions of the Plan," UPS only delegated "administrative duties" to Blue Cross, and UPS retained the authority to decide some appeals. This argument rests on a misunderstanding of the fiduciary designation under ERISA.

In *Kyle Railways, Inc. v. Pacific Administration Services, Inc.*, 990 F.2d 513, 517 (9th Cir. 1993), we held that benefit plan insurers are not fiduciaries "unless they are given the discretion to manage plan assets or to determine claims made against the plan." We cautioned that we do not "narrowly interpret the phrase 'discretion . . . to determine claims.'" *Id.*

"While the mere provision of contractual benefits does not make an insurance company a fiduciary under ERISA, an insurer will be found to be an ERISA fiduciary if it has the authority to grant, deny, or review denied claims." *Id.* at 518 (internal citations omitted). A plan's characterization of a claim administrator's duties as "ministerial" is not determinative: we look past the plan's characterization to determine what duties the administrator actually performs. *See IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419–20 (9th Cir. 1997).

Blue Cross processes and pays claims to plan participants and conducts the first-level appeal for benefit denials. Although the CRC conducts the second-level appeal, Blue Cross makes initial benefit determinations for all plan participants and makes final determinations for those participants who do not appeal their claims to the CRC. This requires that Blue Cross interpret the Retiree Plan to determine whether to pay claims and whether to uphold benefit denials on appeal. *See id*. at 1420. In short, Blue Cross has the authority to grant, deny, *and* review denied claims. Any one of these abilities would be sufficient to confer fiduciary status under ERISA. *See Kyle*, 990 F.2d at 518. The district court erred by ruling that Blue Cross is not an ERISA fiduciary.

## 2. *Misrepresentations*

The plaintiff argues that Blue Cross misled Mrs. King with respect to whether her plan had a lifetime benefit cap and when she reached the benefit limit. Blue Cross responds that all the information it provided to Mrs. King was correct and accurate. The district court ruled that "there is no evidence that Blue Cross made any misrepresentations to

Plaintiff about the plan terms."    Again, we respectfully disagree.

Based on the current record, we conclude that there is a genuine dispute of material fact about whether Blue Cross misled Mrs. King.  We note, however, that there are key pieces of evidence missing from the record on both sides. The plaintiff points to the series of approval letters that Mrs. King received from Blue Cross certifying her treatment as "medically necessary," Mrs. King's phone call with a Blue Cross representative during the last week of January, in which the representative said that she was $10,000 away from the lifetime maximum, and the March 14, 2013 letter stating that Mrs. King reached her lifetime maximum on January 1, 2013.[10]    Although the approval letters all contained a disclaimer that they were "not a guarantee of payment of benefits," they did not mention the lifetime benefit maximum. The letters stated that payment was subject to any limitations in the SPD, but, as discussed, the 2010 Summary of Modifications was ambiguous with respect to whether the lifetime benefit maximum applied to the Retiree Plan.

Blue Cross argues that the representative Mrs. King spoke to in late January "would only have information concerning claims that had been submitted and adjudicated in the ordinary course of business at the time of the call."  Thus, according to Blue Cross, the representative did not falsely

---

[10] In her letter to Blue Cross on March 14, 2013, Mrs. King also stated that the defendants assured her husband that her benefits had no limit and that she "was reassured this was the case at least weekly by case managers who spoke with Blue Cross."  The letter does not specify which defendant made these assurances, and the record does not otherwise indicate whether it was Blue Cross, UPS, or the Retiree Plan.

represent that Mrs. King was $10,000 away from the lifetime limit at the end of January. But Blue Cross does not cite to any evidence in the record with respect to what claims had been received or adjudicated at that point in time. The explanation of benefits Blue Cross sent Mrs. King on February 19, 2013 stated that her benefit claims from November 2012 were denied because she had exceeded the lifetime maximum, while the March 14, 2013 letter Blue Cross sent to Mrs. King stated that she reached the limit on January 1, 2013. A reasonable juror could conclude that Blue Cross made misrepresentations to Mrs. King about the lifetime benefit maximum. Therefore, the district court erred by granting summary judgment to Blue Cross on the breach of fiduciary duty claim.

## IV.    Remedy

In the First Amended Complaint, Mrs. King sought relief under ERISA sections 502(a)(1)(B) and (a)(3). Section 502(a)(1)(B) provides for a civil action "to recover benefits due . . . under the terms of [the] plan," while section 502(a)(3) provides for "equitable relief" to redress ERISA violations. 29 U.S.C. § 1132(a)(1)(B), (a)(3). Mrs. King originally argued that she was entitled to relief primarily because the Affordable Care Act amended ERISA to require the defendants to lift the lifetime benefit maximum in the Retiree Plan. As discussed above, this argument fails.

On appeal, it is unclear whether Mr. King seeks relief under section 502(a)(1)(B), section 502(a)(3), or both. Because the district court granted summary judgment to the defendants, it did not address the appropriate remedy for this violation, and we decline to do so in the first instance. On remand, after the plaintiff specifies whether he still seeks

relief under ERISA section 502(a)(1)(B), what type of equitable remedy he seeks under section 502(a)(3), and why, the district court should determine the appropriate remedy.

## CONCLUSION

The plaintiff's argument that ERISA, as amended by the Affordable Care Act, requires the defendants to lift the lifetime benefit maximum in the Retiree Plan fails. However, the SPD, as amended by the 2010 Summary of Modifications, violates ERISA's statutory and regulatory disclosure requirements, and the district court erred by granting summary judgment to the defendants on the breach of fiduciary duty claims. We therefore reverse the order granting summary judgment to the defendants and remand to the district court for proceedings consistent with this opinion.

**REVERSED and REMANDED.**

# APPENDIX

## Summary of Material Modifications
UPS Health and Welfare Package
UPS Health and Welfare Package for Retired Employees
September 2010



*This notice details Plan improvements, changes, clarifications, and required notifications effective January 1, 2011, unless otherwise noted. Items noted with an asterisk (*) do not apply to retirees or their covered dependents. You should keep this with your UPS Health and Welfare Package and UPS Health and Welfare Package for Retired Employees Summary Plan Description for future reference.*

### Health Care Reform*
In March, President Obama signed into law the Patient Protection and Affordable Care Act (PPACA), also known as "health care reform." Effective January 1, 2011, PPACA requires the following changes to your UPS-administered health care plan. If the PPACA provisions requiring these Plan changes are ever repealed, the changes made solely as a result of PPACA will be terminated and the provisions of the Plan modified by PPACA will be reinstated effective the date the law is repealed.

### Grandfather Plan Status
UPS believes this Plan is a "grandfathered health plan" as defined under PPACA. A grandfathered health plan is permitted to preserve certain basic health coverage that was already in effect when PPACA was enacted. Being a grandfathered health plan means that your Plan may not include certain consumer protections included in PPACA which apply to other plans that are not grandfathered plans. For example, the requirement to provide preventive health services without any cost sharing does not apply to a grandfathered health plan such as your Plan. However, grandfathered health plans are not exempt from all consumer protections included in PPACA. For example, PPACA's prohibition against lifetime limits on "essential benefits" does apply to grandfathered health plans.

Questions regarding which protections apply and which protections do not apply to a grandfathered health plan and what might cause a plan to change from grandfathered health plan status can be directed to the Plan Administrator identified in the Summary Plan Description (SPD). You may also contact the Employee Benefits Security Administration, U.S. Department of Labor, at 1-866-444-3272 or *www.dol.gov/ebsa/healthreform*. This Web site has a table summarizing protections under PPACA, and which do and do not apply to grandfathered health plans.

### Dependent Children Under Age 26
You may now cover a "Child" through the end of the month in which the child turns age 26. A "Child" is defined as your natural child, your adopted child, a child

placed with you for adoption, or a child for whom you are the legal guardian (as determined in accordance with applicable law).

If you have a "Child" who previously lost coverage under your Plan, was denied coverage, or was otherwise not eligible for coverage under your Plan because he or she did not satisfy your Plan's prior definition of dependent child (for example, your child turned age 19 but was not a full-time student), you will have 30 days, beginning the first day of the annual enrollment period, to enroll yourself (if eligible but not enrolled) and/or your child in the Plan. If you enroll your child during the 30-day enrollment period, coverage for your child will be effective on January 1, 2011 (provided that the individual is a child on January 1, 2011). Notwithstanding anything to the contrary, an otherwise eligible child is not eligible for coverage under this Plan if the child is eligible for coverage another employer-sponsored plan (other than the parent's employer-sponsored plan—keep in mind that the child could be eligible for the parent's employer-sponsored plan as both a dependent and an employee).

A covered child who becomes incapacitated while covered under the Plan and before he or she turns age 26 is eligible to continue coverage after turning age 26 as long as you are eligible and as long as the following conditions are satisfied: (i) the incapacity exists, (ii) the child is unmarried, (iii) the child is primarily dependent on you for support and maintenance, and (iv) appropriate certification of disability is provided. You must apply to continue coverage for an incapacitated dependent prior to age 26.

The child must have a mental or physical incapacity that renders the child unable to care for him- or herself, as determined by the claims administrator. To apply for continuation of coverage for an incapacitated dependent, contact your claims administrator. Certification of the incapacitation by the claims administrator must occur prior to coverage being continued under the Plan. Certification must also occur before coverage is lost under the Plan. In addition, periodic medical documentation of

1

UPS000029

the continuing incapacity is required as determined by the claims administrator.

In addition, the following benefits previously provided only to children under age 19 are revised as follows:

- Charges for hearing exams and one hearing aid per ear every three years for children up to age 26 (must be prescribed by an otolaryngologist).
- Benefits are allowed for teeth straightening for your dependent children under 26 years of age. Services provided by the end of the month in which your child turns 26 are covered, as long as treatment began before the child's 26th birthday.

**Elimination of Lifetime Maximum Benefits**
Lifetime dollar limits on aggregate benefits will be eliminated from your Plan effective January 1, 2011. If you are an otherwise eligible employee whose coverage previously ended upon reaching your lifetime maximum benefit under the Plan, you will have 30 days, beginning the first day of the annual enrollment period, to re-enroll in the Plan. If you choose to enroll, your coverage is effective January 1, 2011 (as long as you continue to meet the Plan's eligibility requirements). You may also enroll any dependents whose coverage ended upon reaching their lifetime maximum.

**Elimination of Lifetime and Annual Dollar Limits for "Essential Benefits"**
Effective January 1, 2011, lifetime and annual dollar limits on essential benefits will be administered in accordance with PPACA. This means the dollar maximums on the following "essential benefits" will be eliminated:

- Lifetime limit on orthodontia
- Annual dollar limit on infertility drugs (only for participants in the applicable Aetna HMO)

**Elimination of Pre-existing Conditions on Benefits for Children Under Age 19**
Pre-existing condition limits will be eliminated from your Plan effective January 1, 2011, for children under age 19. The following are considered by PPACA to be the only pre-existing conditions under the Plan. All language in the SPD will otherwise continue to be administered based on the terms and intent of the Plan, with only the pre-existing condition exclusions removed in the following provisions for children under age 19:

- Cosmetic/plastic surgery needed to correct a malformation as a direct result of disease, surgery performed to treat a disease, or an accidental injury that occurred prior to coverage under the Plan is not covered.
- Dentures and bridgework for replacement of teeth extracted before the patient was covered by a UPS dental option are not covered.

- Orthodontia treatment already in progress prior to becoming covered under the Plan is not covered.
- Replacement of congenitally missing teeth is not covered.

**HCSA Reimbursement of Over-the-Counter Drugs**
Any expenses incurred on or after January 1, 2011 for over-the-counter (OTC) medicines or drugs (with the exception of insulin) will be eligible for reimbursement from a Flexible Spending Account such as your health care savings account (HCSA) only if the medications are prescribed by a physician. The terms "medicines or drugs" and "prescribed" will be defined in accordance with applicable IRS regulations.

## Mental Health Parity
Effective January 1, 2011, the administration of your behavioral health coverage will be amended per the federal regulations set forth in the Mental Health Parity and Addiction Equity Act.

**Deductibles and Out-Of-Pocket Maximums**
All behavioral health charges for out-of-network treatment will now apply to your out-of-network medical deductible.

All in-network behavioral health charges will now apply to your in-network, out-of-pocket maximum.

All out-of-network behavioral health charges will now apply to your out-of-network, out-of-pocket maximum.

**Precertification Requirements**
All inpatient behavioral health treatment (including but not limited to partial hospitalization, intensive outpatient treatment and residential treatment) must be precertified with ValueOptions. If you use a ValueOptions network provider or facility, they will begin the precertification process for you. If you have the Traditional medical option and use an out-of-network provider or facility, you are responsible for starting the precertification process yourself. If you do not call ValueOptions to precertify an inpatient stay when it is required, you will pay a $250 fee for failure to precertify. The $250 fee will not apply toward your out-of-pocket maximum. All inpatient treatment must be determined to be medically necessary by ValueOptions.

ValueOptions must always precertify the following services, regardless of whether an in- or out-of-network provider or facility is used. If you fail to have these services approved in advance, no benefits are payable.

- Psychological testing
- Complex medication management
- Electroconvulsive therapy (ECT)
- Biofeedback
- Hypnotherapy
- Aversion therapy

2

UPS000030

There is no precertification requirement for in- or out-of-network outpatient treatment. However, all treatment must be determined, by ValueOptions, to be medically necessary.

To ensure you receive the maximum benefits under the Plan, you should always contact ValueOptions at 1-800-336-9117 prior to seeking any mental health or substance abuse treatment.

Mental health parity legislation does not affect the Solutions – Your EAP and Work/Life Benefit program, also administered by ValueOptions. You are eligible to receive six free in-person visits (per issue, per year) with a licensed, in-network Employee Assistance Program provider, as well as referrals for legal, financial and work/life resources. Refer to your SPD or contact ValueOptions at 1-800-336-9117 for program details.

## Hyatt Legal Plan

The Hyatt Legal Plan will offer the following new services:

- **Adoption and Legitimization (Contested and Uncontested).** This service covers all legal services and court work in a state or federal court for an adoption by the legal plan member and spouse. Legitimization of a child by the legal plan member and spouse, including reformation of a birth certificate, is also covered. This includes international adoptions.
- **Security Deposit Assistance.** This service covers counseling the participant as a tenant in recovering a security deposit from the participant's residential landlord for the participant's primary residence; reviewing the lease and other relevant documents; and preparing a demand letter to the landlord for the return of the deposit. It also covers assisting the participant in prosecuting a small claims action; helping prepare documents; advising on evidence, documentation and witnesses; and preparing the participant for the small claims trial. This service does not include the legal plan attorney's attendance or representation at the small claims trial, collection activities after a judgment or any services relating to post-judgment actions.

## Women's Health Rights

The Women's Health and Cancer Rights Act requires that we notify you annually that your Plan provides coverage for the following after a covered mastectomy:

- Reconstruction of the breast on which the mastectomy was performed
- Surgery and reconstruction of the other breast to produce a symmetrical appearance
- Prostheses, and
- Treatment of physical complications of all stages of a mastectomy, including lymph edemas.

Coverage will be subject to the same annual deductible and coinsurance provisions and other limitations and exclusions applicable under the Plan.

## Privacy Notice

Federal privacy rules under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) require health plans and health plan providers to protect the privacy of certain health information, while allowing the flow of information needed to provide high-quality health care. UPS has provided employees covered under a UPS-administered health care plan with a privacy notice describing the permissible uses and disclosures of health plan information.

To obtain a copy of that notice, you can:

- Visit *www.upshealthyconnections-informedchoices.com* and click the Privacy link at the bottom of each page of the site;
- Log on to *www.UPSers.com* and find your health care benefits information under the My Life and Career tab; or
- Call the UPS Benefits Service Center toll-free at 1-800-UPS-1508.

3

UPS000031

This notice is intended to fulfill UPS's legal obligation to notify employees of material changes to the UPS Health and Welfare Package and the UPS Health and Welfare Package for Retired Employees. This notice formally amends the coverage available under the Plans.

© 2010, United Parcel Service of America, Inc. All Rights Reserved 9/10

211-0008

UPS000032

427